Gage *v.* Schavoir.

---

HARRIETT E. GAGE ET AL. *vs.* ARNOLD L. SCHAVOIR.

Third Judicial District, New Haven, January Term, 1924.

WHEELER, C. J., BEACH, CURTIS, KEELER and KELLOGG, Js.

If the laches of the plaintiffs make it difficult or impossible for a court of equity to enjoin the defendant without inflicting a disproportionate damage and loss to him thereby, an injunction may well be refused and the plaintiffs be left to their remedy at law.

In 1912 a considerable tract of land in Stamford was plotted, subdivided and sold in building lots, restricted in their use mainly but not exclusively to residential purposes, most of which are occupied by one or two-family houses by tradesmen, mechanics and others of modest means. The defendant in 1912 bought six of these lots subject to the common restriction, and upon one of them built a one-story brick garage and auto-shop which was afterward gradually enlarged and other buildings added until at the time of the trial he had a factory plant and equipment worth $80,000 or more, in which he was making rubber toys at an excellent profit. During this period of gradual extension no objection was raised by the plaintiffs or other lot owners in the tract to the use the defendant was making of his premises, and some of the plaintiffs and other lot owners had themselves violated, in other respects, the restrictions in their deeds. It appeared that land not far away from the tract in question was unrestricted in its use; that the defendant's factory caused the plaintiffs and others but little actual annoyance and only slightly depreciated the salable value of their property, while the damage to the defendant, if obliged to close out his business there, would be very great and out of all proportion to the damage which, at best, was but meagerly shown by the plaintiffs; and that the defendant had acted throughout in good faith and had been solicitous to avoid any unnecessary injury to others. *Held* that under these circumstances, and especially the laches of the plaintiffs, it was clearly within the sound discretion of the trial court to refuse an injunction, and to remit the plaintiffs to their legal remedy.

The appellants sought to have the finding corrected in certain paragraphs. *Held* that in so far as their requests were refused, the findings as made were supported by competent evidence and no error was committed by the trial court in declining to change them.

Argued January 15th—decided May 8th, 1924.

SUIT to restrain the defendant from maintaining and operating a factory upon his premises in alleged violation of restrictions imposed upon his property by deed, brought to and tried by the Superior Court in Fairfield County, *Maltbie, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiffs. *No error.*

*Thomas J. Ryle*, with whom was *Stanley P. Mead*, for the appellants (plaintiffs).

*Raymond E. Hackett,* for the appellee (defendant).

KEELER, J. On June 11th, 1912, the executor of the will of Isaac Wardwell, deceased, conveyed to Frank B. Gurley, a tract of land of considerable size theretofore divided and mapped out into lots for purposes of sale and development, named Bradford Park. It is intersected by a number of then existing public highways, and in addition to these highways a number of new streets were cut through various parts of the property, among them Frederick Street, hereafter mentioned. This deed from the executor to Gurley contained a restrictive covenant as printed in the footnote.

"This deed is given and accepted upon the express covenant and agreement on the part of the Grantee, his heirs and assigns, that no building erected upon the Lots numbered Fifty-one (51), Fifty-two (52), Fifty-three (53), Fifty-four (54) and Fifty-five (55) on said map shall be of a less first cost than Four Thousand (4,000) Dollars; that none of the lots fronting upon Shippan Avenue or Elm Street or upon Frederick Street North of Elm Street shall have any dwelling house erected thereon of a less first cost than Thirty-five Hundred (3500) Dollars, that no building North of Elm Street shall be erected upon any of said land this day conveyed other than a single front dwelling house without any outside stairway to the second or higher story thereof, and no building North of Elm Street, so erected, shall be used for any other than residential purposes excepting buildings which may be erected upon Lots Numbered Eighteen (18) to Thirty (30) inclusive on said map, which may have buildings erected upon the same to be used for business purposes; that no lot delineated upon said map with a frontage of Fifty (50) feet on same shall be subdivided for purposes of building unless said subdivision shall result in making lots of more than Fifty (50) feet front, that the front wall of houses erected on the Lots Numbered One (1), Two (2), Three (3) and Seven (7) on said map shall not be nearer to the street line than a distance of Thirty (30) feet, that Lots Numbered Fifty-one (51) to Fifty-five (55) inclusive on said map shall not have the front walls of houses erected thereon nearer to the street line than Twenty-five (25) feet and that on all lots fronting on the North side of Elm Street and all lots on said map lying North of said Elm Street (except those hereinbefore allowed to be used for business purposes) no houses shall be erected with the front wall nearer than Twenty (20) feet from the street line, that for a period of fifteen (15) years next

Gage *v*. Schavoir.

Fifty of the lots contained in the development tract lie north of Elm Street of which thirteen were permitted to be used for business purposes, and the remainder were restricted as to erections thereon to single front dwelling-houses exclusively residential, without outside stairways to a second or higher story, the same to be set not nearer than twenty feet from the street line. Upon the rest of the whole tract the lots are not restricted to residential use.

In June, 1912, defendant purchased lots numbered from one to six inclusive upon the part of the tract lying north of Elm Street. His purchase deed expressly referred to the restrictions above named without giving them in full. He never saw the deed and had only a general knowledge of the purport of the restrictions. At about the time of his purchase he spoke to his grantor, Gurley, regarding the restrictions, whom he told of his intention to construct a garage and automobile repair shop, and was told he would not be bothered about them. This was the only assurance that he received regarding the enforcement of restrictions. He has never received any release or waiver of the same from any of the plaintiffs or from the estate of Isaac Wardwell. Defendant was without experience of the nature and obligation of such restrictions and attached no particular significance to them as contained in his deeds. He relied upon Gurley's assurance, and had no conscious intention to violate the rights of anyone. The plaintiffs who at the trial were still prosecuting this action took title to their several lots in 1912, 1913, 1915, 1919 and 1920. Each of their purchase deeds contained the restrictions above referred to.

In October, 1912, the defendant erected on one of

succeeding the date of this deed no building erected upon any of said land delineated on said map shall be used for the sale or storage of intoxicating liquors of any sort or kind."

the lots bought from Gurley, a one-story brick garage and auto shop, measuring twenty-eight by forty-six feet. This building was used as a garage, repair shop and service station till July, 1914. In March, 1914, he added a second story to this garage. From 1914 to 1916 defendant used the ground floor of this building as a private garage, and for a few months used the second story in attempting the manufacture of valves. In connection with other machinery he installed certain machines including a ten horse power upright boiler, with a smokestack twenty-five feet high. During that time he employed four workmen and two draughtsmen. This work continued during 1915, and was then abandoned, and some prior to 1918 the machinery and equipment was sold. In the latter part of 1916 and early in 1917 the defendant began making rubber toys in the building, and from that time until 1922, defendant at brief intervals added buildings and machinery, and during the latter part of this period much light equipment was substituted for some of the heavier type; from twenty to twenty-five per cent of defendant's investment was made since the institution of the action against him. The present value of his total machinery and equipment is about $57,000. The present value of the lots owned by the defendant is about $6,000, and of the buildings about $17,500.

The volume of work done on the premises has steadily increased; in the years 1912 to 1916 inclusive, before the defendant began the manufacture of toys, and including in the first year some automobile sales, its value was estimated by the defendant to be about $20,000 to $29,000 each year. In 1917 the volume of business transacted amounted to $19,000; in 1918 it amounted to $27,000; in 1919 it amounted to $33,000; in 1920 the amount of business done on the premises in the manufacture of toys and also including a government

contract in connection with gas masks, amounted to
$74,726; in 1921, including the same manufactures, it
amounted to $138,066.37; in 1922 the business done
was in the manufacture of toys alone, and it amounted
to $91,457.97. At the time of the trial the defendant
had on hand orders for deliveries up to November,
1923, in the amount of $125,000. Prior to 1919 the
defendant employed in his business between three and
five hands as an average. In 1919 he employed thirteen;
in 1920, twenty-seven; in 1921, twenty-two; in 1922,
thirty-four, and at the time of the trial in 1923, forty-
three men were employed.

From the time when the defendant erected the brick
garage in 1912 until the time when the action was
started, he has almost continuously used his property
for business purposes in violation of the restrictions
upon it, and from 1917 he has, except for two months
when he closed the factory to take his men elsewhere
to do war work, continuously used it for manufacturing
purposes; and since that year he has been engaged
in manufacturing rubber toys. The property became
obviously permanently dedicated to manufacturing
purposes in 1914 and 1915. The use by the defendant
of the lots in question for business purposes contrary
to the restrictions of the deed has been open, notorious
and obvious ever since the latter part of 1912, and its
use by the defendant for factory purposes, namely,
the manufacture of rubber toys and other articles, has
been open, notorious and obvious since 1917. During
the time that the defendant was engaged in making the
additions to the buildings and the additions and im-
provements to the property, and during the time that
he was using the property for business purposes, no
protests or objections were ever made by anyone to the
defendant concerning the use of the premises by him
in the manner in which he was using them, and it was

not until two weeks before the action was started, which was July 8th, 1921, and about two months after all the buildings had been completed, that the defendant first learned there was any objection by anyone to his use of the property in the manner in which it was then and formerly used. No secrecy was used by the defendant in this use of his property, and a casual observation of the premises or of the work which was being done there would have disclosed the nature of the business which was being transacted.

The conduct of the plaintiffs and the other owners of lots on this tract was such as would naturally lull the defendant into a belief that they did not intend to enforce the restrictions against him and to encourage the defendant to build up his plant and business in that location. The greater portion of the machinery and equipment in the defendant's factory could be transported to another location without great trouble or expense; it would not be impossible to move the heavier machinery, the mixing mills and calendar, to another location, but it would be expensive and difficult. The defendant could move his factory to a new location, and, once established, could carry on his business there as well as where he now is; but such a move would cause a serious interruption in his business; and, as no one else would be able to use his present buildings for manufacturing if he could not, a removal would result in a total loss of his investment in those buildings. No one could expect a factory of the size of the defendant's to be less annoying in its operation; the noise and vibration from it is inconsiderable; the smoke would, unless perhaps when the atmosphere was unusually heavy, be dissipated without harm to anyone, and when hard coal is used, which the defendant prefers when he can get it, there would be no trouble at all from that source; and there is no offensive odor noticeable outside

of the factory. The factory creates very little actual annoyance to the plaintiffs or other lot owners in "Bradford Park." The defendant has been solicitous to avoid any unnecessary annoyance from the factory; in fact, one reason for constructing the present smoke-stack so high was to decrease the danger of annoyance from smoke.

Some of the plaintiffs whose lots were subject to the above quoted restrictions have violated the same by building somewhat beyond the front building line, some by erecting outside stairways, and one of them by carrying on the business of a carpenter in a small way.

There are in the immediate vicinity of defendant's factory a few high-class residences with spacious grounds. Aside from these, the general character of the whole neighborhood, and particularly that of "Bradford Park" is residential, the houses being rather ordinary residences, occupied as homes by tradesmen and mechanics; for the most part these are designed and occupied as two-family houses, with a few single houses and a few occupied by three or even more families, and with a scattering of small stores. Within a short distance of the property of defendant and of the plaintiffs there is considerable land in no way restricted.

There has been no substantial change in the neighborhood as a whole since 1912, and its character is still principally residential. Future development will probably be mostly in the construction of houses for two families with a scattering of small retail business establishments. There is no prospect of improvement in the neighborhood, and there is an ever present danger of inroads for business, manufacturing and like purposes. Since the institution of the suit six new houses have been erected on lots on said tract, viz: lots

thirty-three, forty-two, forty-four, twelve, thirteen and forty-eight, and there have been erected directly to the north of the Schavoir factory, on another tract, three new houses. The presence of defendant's factory makes property in its immediate neighborhood somewhat less salable and in certain circumstances less rentable; the plaintiffs who have sold their houses since this action was begun have, however, received a fair price for them, and all the tenements in the houses of the plaintiffs have been occupied and there has been a general increase in the rentals paid; but the latter may have been, in part at least, due to the fact that there has been for a number of years in Stamford a large rental demand and small rental supply. The value of the plaintiffs' properties has not been depreciated to any considerable extent by the plant of the defendant, and the houses do not command less rentals.

The following conclusions were reached by the court: "(1) The restrictions contained in the deed to Gurley attached to the lots bought by the defendant, and gave rise to an obligation on his part to act in accordance with them enforceable by the other owners of lots on 'Bradford Park,' including the plaintiffs. (2) The defendant violated these restrictions by establishing and developing his plant and business on the lots. (3) But under all the circumstances of the case it would be inequitable to grant the plaintiffs the relief by injunction claimed by them." Judgment was rendered for the defendant.

After the conclusion of the trial, the trial judge, with the consent of both parties, visited the premises of the defendant, spending about a half-hour there, and also viewed the neighborhood about the defendant's factory, and his finding is based in some measure upon the observations then made. There was nothing then observed, however, which is not included in the finding

as made.  Of the finding of the court, the plaintiffs asked certain corrections some of which were granted and incorporated in the finding, and some were refused.

As regards the corrections requested in paragraphs one and two, the evidence printed in the record bears the construction placed on it by the court and is not without evidential support.  Paragraphs three and four of the requests were granted, and paragraph five was not pursued in this court.  Paragraph six of the requests was denied by the trial judge for the reason stated in his memorandum as to corrections, referring to his original memorandum of decision in which he says that he inferred that certain of the plaintiffs who had sold their holdings since the commencement of the action had received a fair price, since they did not appear at the trial of the action.  We cannot say that this inference was forced or unreasonable, and so that the refusal to strike out the finding was erroneous. Paragraphs seven and eight were denied by the trial judge for the reason stated in his memorandum on the motion, that taking into consideration the situation disclosed by the evidence as a whole, he could not put sufficient credence in the quoted evidence to accept the estimates [of loss of value] of the witnesses as correct.  An examination of the testimony of the real-estate experts produced by the plaintiffs discloses such a lack of connection between the facts stated by the witnesses and their conclusions as to justify the action of the court, especially when this testimony is compared with other facts found by the court, and the refusal to correct was not erroneous as opposed to uncontradicted testimony.

In addition to the errors assigned with reference to corrections of the finding and above considered, there are thirty assignments of error concerned with what the plaintiffs claim to be matters of law.  Some of

these assignments are properly made, others as objected to by defendant's counsel are not so made, but there are certain of them assigned sufficiently as properly to support the five contentions into which plaintiffs' counsel group the various assignments. It is contended: (1) that defendant was bound by all facts appearing in the land records, and that it is immaterial that surrounding land was unrestricted; (2) that defendant did not develop his factory in good faith nor was it developed as a factory prior to 1920; (3) that any trivial violation of the restrictions by some of the plaintiffs was not a defense to the greater violation of the same by defendant; (4) that defendant cannot urge his own previous minor violation of the restrictions to justify his later and more material violation of them, and that no conduct of the plaintiffs justified defendant's breach of these restrictions; (5) upon the facts found the plaintiffs were entitled to the relief sought.

All of the above noted claims of error on the part of the trial court, in judgment of their validity, are to be taken in connection with the conclusions of law reached by it, that is, the court's reason of decision. The court finds expressly that the defendant had violated the restrictions imposed by the covenant in his purchase deeds. In refusing a remedy for this violation the court very properly, in view of the situation, applied the doctrine of negative or equitable easement whereby the grantees of a common grantor who has in deeds to successive grantees inserted restrictive covenants for the benefit of a tract divided into several parcels, may as against each other enforce by injunction the observance of the restrictions so created. (See 4 Pomeroy's Equity Jurisprudence (4th Ed.) § 1696; *De Gray* v. *Monmouth Beach Club House Co.*, 50 N. J. Eq. 329, 340, 24 Atl. 388; *Fisk* v. *Ley*, 76 Conn. 295, 56 Atl. 559.) The court gave the plaintiffs the full benefit of this doctrine, and its

application was not disputed by the defendant. The trial court held that the plaintiffs had lost their equitable right by laches and gave judgment for defendant, and this is to be constantly borne in mind in considering the various errors claimed by plaintiffs.

Passing to consideration of the plaintiffs' first claim of error, there is no question but that defendant was bound to know and was presumed to know just what the records disclosed as to the restrictions upon the lot sold him, and the trial court so held, but in determining the equities of the plaintiffs, it was of importance to know the nature of the surrounding neighborhood, what sort of buildings had been erected there and what sort of buildings legally could be erected there, and to what uses these buildings legally might be put. The character of the vicinity as to its improvement might be such that an enforcement of plaintiffs' rights would be valueless, which fact, if found true, would go far in justifying the refusal of injunctive relief. The trial court did not err in finding and considering facts in this regard, nor in their application.

Taking up the question of good faith of defendant in his building operations and the business carried on by him, challenged in the second contention of plaintiffs' argument and brief, it appears from the finding that as the defendant enlarged his business and in connection therewith his equipment and plant, his progress was gradual, but his object was clear to all beholders. He had a factory and from time to time enlarged it, he employed men in a progressively increasing number, whose comings and goings were obvious to residents in the vicinity.

The plaintiffs' third point, that the violation of the restrictions by them in matters claimed to be trivial is no defense to greater violations by defendant, is correct to the extent that such violations are not a com-

plete equitable defense, and the trial court did not hold that they were such, but did consider them as evidencing the mind and disposition of plaintiffs as bearing upon the question of laches, in noticing which they will be considered by us. It may be remarked, however, as covering certain claims of the plaintiffs in regard to triviality and of a wrong construction by the court of the physical characteristics of the alleged breaches, that the trial judge had the advantage of a personal view of the structures referred to, and also gained thereby an adequate conception of the general situation and development of the real property in the vicinity.

The fourth point made by the plaintiffs asserts error in that the court held that minor violations by defendant were a defense to subsequent more material violations of the restrictions. We do not so interpret the finding of the court, which only considered these and the action or inaction of the plaintiffs with reference to the same as bearing upon defendant's good faith, and also on laches on the part of plaintiffs. We have already considered the matter of good faith, and will consider the question of laches in connection with the plaintiffs' fifth and last contention, that the court erred in not holding upon the facts as found that plaintiffs were entitled to the claimed relief of an injunction closing the plant.

The doctrine of laches in asserting an equitable claim is carefully and extensively considered in *Fisk* v. *Hartford*, 70 Conn. 720, 40 Atl. 906, and the opinion in that case gives a rule regarding the application of the doctrine which is definite and comprehensive. On page 732, the opinion reads: "It is a well established rule in equity that if a party is guilty of *laches* or unreasonable delay in applying for an injunction, he may thereby forfeit his claim to that special form of remedy; and where in such case, by his *laches*, he has made it impos-

sible or very difficult for the court to enjoin his adver-
sary without inflicting great injury thereby, an injunc-
tion should be refused and the party left to his remedy
at law." This clear enunciation of the rule foreshowed
in the opinions of the court in *Enfield Toll Bridge Co.* v.
*Connecticut River Co.*, 7 Conn. 28, 50; *Whittlesey* v.
*Hartford, P. & F. R. Co.*, 23 Conn. 421, 433; and fol-
lowed in *Mitchell* v. *Southern New England Telephone
Co.*, 90 Conn. 179, 183, 96 Atl. 966, is in accord with
the generally prevailing rule; 4 Pomeroy's Equity Ju-
risprudence (4th Ed.) § 1702. Many apposite cases are
cited in the briefs of plaintiffs and defendant to this
point, but none of them modify or supplement the rule
as to laches as above defined, but are concerned with
the application thereto of varying states of fact. We
therefore are to consider the rule in connection with the
facts found in the instant case.

We have before said that the conduct of some of the
plaintiffs with reference to the restrictions in their deeds,
while not so flagrantly violative of the same as for that
cause alone to deprive them of relief, has a bearing
upon the question of laches on their part. Their
attitude toward the restrictions was certainly not one
of scrupulous and obedient respect. It is true as the
plaintiffs claim, that if even one of them is entitled to
equitable relief, judgment for such relief as is proper
must follow, and the trial court so held, and we are
now considering the facts just stated as indicating the
significance attached by the plaintiffs to the continued
enforcement of these restrictions. If they were alive
to the importance and value of the restrictions to the
extent that their counsel now claim, they could hardly
have failed to discover the violations of the restrictions
above commented on, as well as some of the same sort
of disregard by persons not parties to this action which
the trial court found to exist. The true state of affairs

seems to have been that these parties were not seriously hampered by any consideration of the restrictions where their several interests suggested a departure therefrom, and that the limitations imposed by the deeds were not regarded as important among friends.

Briefly appraising the outstanding facts appearing in the finding, which the plaintiffs observed or might have observed in the conduct of the defendant with reference to the use of his property, and which if observed should and would have received attention if they had been alert and vigilant in the protection of their rights, we find that although the business of the defendant was not extensive in the two years from 1912 to 1914, yet in the latter year and in 1915, the raising of the brick building by adding a second story as found by the court, and its use in manufacturing in these years closely indicated a permanent design to continue in that line of effort. The only change to be observed was that of increased production and increased employment of workmen. All the facts found point to this period as the one of determining significance, rather than the addition of a wooden building to the plant in 1921. The products of manufacture changed, and changes in machinery and equipment consequent thereon were made, and were evident to anyone residing in the vicinity. From 1912 on there was a continuous use of the property for business purposes, in violation of the restrictions, and from 1917 on, except for two months when the defendant closed his factory and went elsewhere with his employees to do war work, there was a continuous use of the premises for manufacturing purposes. The addition of a wooden building in 1921 marked the culmination of successive additions to the plant, and did not manifest a sudden change and increase of business or manufacture, as the plaintiffs

claim. In 1918, there was heavy hammering productive of noise, which continued till 1920, when the defendant was more and more concentrating on the production of rubber toys, and in adapting his equipment to that line of work, he adopted machinery which to some extent was of lighter construction, but still retained some heavy machinery. About the time of bringing this action and for sometime previous, there had been no sudden expansion of manufacture nor increased activity resulting in more annoyance to nearby dwellers than had obtained for a considerable period theretofore. Not to repeat at length the finding of the trial court regarding the question of actual annoyances to residents in the vicinity, and a consequent depressive effect on values of the surrounding property for sale or rental, we observe that the trial judge found the noise and vibration inconsiderable, little or no trouble from smoke unless the air was unusually heavy, and no noticeable offensive odor.

Anyone keeping watch of the plant and its increase in extent and equipment during the nine years previous to the bringing of this action, could have drawn no inference but that of the steady progress and remarkable growth of the enterprise, which from 1912 to 1916 yielded an estimated return of between $20,000 and $30,000, and in 1921 yielded $138,000. What was going on was perfectly evident, yet it was not until 1921, and two weeks before bringing suit, that the plaintiffs thought themselves sufficiently aggrieved by the unlawful activities of defendant to make any complaint or protest. The value of defendant's property at the time of the trial of the action was above $80,000; when defendant started operations it was worth about $7,000. In the face of this visible growth the plaintiffs did nothing and said nothing until June, 1921. No other construction can be put upon their conduct,

except that thereby defendant was disarmed of any fear of interference with his operations, encouraged to continue in his course, and lulled into belief of security from any attack for violation of the restrictions which his grantor, Gurley, had assured him that he would not be bothered about.

The trial court has found that the damages resulting to plaintiffs from defendant's operations are slight and not demonstrated in an adequate way, and that the loss likely to accrue to the defendant if obliged by injunction to close out his business in this locality will be very great and altogether out of proportion with the claimed, but slightly supported, damage of the plaintiffs. The case is therefore one where the granting of an injunction would be productive of great hardship and oppression to the defendant, who apparently has been led into his present position largely through the laches of the plaintiffs, and the trial court exercised the "sound discretion," spoken of in *Fisk* v. *Hartford*, 70 Conn. 720, 40 Atl. 906, as a proper criterion in cases of this sort, in refusing an injunction.

There is no error.

In this opinion the other judges concurred.