HELEN M. HICKSON *vs.* NOROTON MANOR, INCORPORATED.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued January 2d—decided February 8th, 1934.

*P. Lawrence Epifanio,* with whom was *Charles E. Moore,* for the appellant (plaintiff).

*Frederick Lovejoy, Jr.,* with whom, on the brief, was *Joseph R. Taylor,* for the appellee (defendant).

BANKS, J. On October 24th, 1928, the defendant deeded to the plaintiff certain property described in the deed as a portion of lot number thirty-two on a map of property of the defendant in Noroton, with a covenant of warranty that the same was free from all encumbrances except certain conditions and restrictions mentioned in the deed. The plaintiff claims a breach of the covenant of warranty, in that the land conveyed to her is subject to certain other restrictions in favor of the owners of other lots in the tract upon such map, and that by reason of such restrictions the title to the premises is unmarketable.

From the finding, which is not subject to material correction, the following relevant facts appear: On June 21st, 1922, the estate of Henry D. Weed deeded to the defendant a forty-acre tract of land in Noroton. The deed contained a number of restrictive covenants, including one that that portion of the property described as "the middle zone" should not be subdivided into lots having a frontage of less than fifty feet each and an area of less than six thousand square feet, on each of which there should be constructed not more than one single family private residence. The defendant had a map made of the premises, showing a division into lots under a general development scheme, which was recorded with the deed.

On August 1st, 1923, an agreement was executed

by the defendant and the executor of the Weed estate modifying the restrictive covenants in the deed to the defendant, including a modification to the effect that the property in the middle zone (excepting lots 53 to 57 inclusive) should not be subdivided into lots having a frontage of less than one hundred feet each and an area of nine thousand square feet. Thereupon the tract was replotted by the defendant and a map, known as Map No. 3, showing the new subdivision, was recorded in the land records. This map, the restrictive covenants and the agreement modifying the restrictions, show a general scheme or plan for the development of the tract into a high type residential neighborhood. With the exception of lots 53 to 57 inclusive, all of the lots in the middle zone on the map have a street frontage of one hundred feet, except in the case of two corner lots, numbers 32 and 50. Lot 32 had a frontage of 148.80 feet on Beach Drive, 64.84 feet on a curve forming the corner, and 179.81 feet on Outlook Drive. Lot 50 had a frontage of 197.35 feet on one side, of 146.37 feet on a curve forming the corner, and of 70 feet on the other side. Subsequently the defendant had another map printed upon which lot 32 is shown as divided into two lots, lot 32A, which has a frontage of one hundred feet on Beach Drive, and lot 32B, the lot sold to the plaintiff, which is bounded on Outlook Drive 179.81 feet, on the curve formed by the intersection of Outlook Drive and Beach Drive 64.84 feet, and on Beach Drive 48.80 feet. Prior to its deed to the plaintiff, the defendant had sold thirty-five lots in this tract. In substantially every such sale the deed referred to the Map No. 3 and recited that the premises were subject to restrictions to be construed as covenants running with the land and to bind the grantee, his heirs, executors, administrators and assigns, which included a covenant

that "said premises shall not be subdivided and not more than one single family private residence may be erected." The plaintiff's deed referred to the map and contained this same recital and specific restrictions.

The plaintiff claims that the subdivision of lot 32, as a result of which the lot which she purchased has a frontage in a straight line on Beach Drive of only 48.80 feet, is a violation of the express restriction in the Weed modifying agreement that the premises should not be subdivided into lots having a frontage of less than one hundred feet each, that it violates the express restriction in all of the deeds of the defendant that the premises should not be subdivided and that only one single house should be erected on a lot, and that it also violates a restriction forbidding a division of lot 32, which it is claimed is to be implied from the filing of the map in connection with the defendant's general development plan. She further contends that the owners of other lots in the restricted tract have the right to enforce these restrictions as against the lot sold to her by the defendant, with the consequence that there has been a breach of the covenant against encumbrances in its deed to her.

A valid restriction upon the use of real estate is an encumbrance, *Storrs* v. *Pannone*, 113 Conn. 328, 331, 155 Atl. 234, and may constitute a breach of the covenant against encumbrances. 2 Tiffany, Real Property (2d Ed.) § 452, p. 1685. The restrictions in the Weed modifying agreement and the deeds of the defendant were imposed in pursuance of a general plan of development of the restricted tract, and constitute negative easements which may be enforced by any grantee against any other grantee, each parcel becoming both a dominant and a servient tenement. *Gage* v. *Schavoir*, 100 Conn. 652, 662, 124 Atl. 535; *Arm-*

*strong* v. *Leverone*, 105 Conn. 464, 471, 136 Atl. 71; *Bickell* v. *Moraio*, 117 Conn. 176, 180, 167 Atl. 722. The grantees of the other lots in the restricted area have the right to enforce these restrictions, and if the subdivision of lot 32 constituted a violation of the restrictions, there was a breach of the covenants against encumbrances in the defendant's deed to the plaintiff.

The plaintiff contends that there is a violation of the restrictions in the Weed modifying agreement against a subdivision into lots having a frontage of less than one hundred feet, in that the lot deeded to her has a frontage on a straight line of only 48.80 feet on Beach Drive, although it is also bounded 179.81 feet on Outlook Drive. The claim is that the word "frontage," as used in this restriction, is to be construed as referring to that side of the lot which has the shorter street line, and therefore, in this case, to the frontage upon Beach Drive to the exclusion of the frontage on Outlook Drive. A lot has a street frontage upon any street upon which it abuts, and in the case of a corner lot has a frontage upon both streets. Where it becomes of importance to determine upon which of the two streets the lot may be said to "front," it has been said that in the case of the ordinary city lot the general usage of building houses with their main entrance upon the shorter street line results in an understanding that that is the side intended when the "front" of the lot is referred to, but that the term is far from one of art, and its meaning is almost invariably to be determined by the context in which it is used and the surrounding circumstances. *Rhinehart* v. *Leitch*, 107 Conn. 400, 403, 140 Atl. 763.

Here the question is not, strictly, upon which of the two streets the plaintiff's lot "fronts," but whether it has "a frontage of less than 100 feet" within the mean-

ing of the restriction. We find nothing in the wording of the restriction or the surrounding circumstances which requires that the plaintiff's lot should have a frontage of at least one hundred feet on Beach Drive. In the original deed from the Weed estate the restriction provided that lots should have a frontage of not less than fifty feet and an area of not less than six thousand square feet. Upon the map which accompanied that deed most of the lots on Beach Drive had a frontage of one hundred feet, and most of those on Outlook Drive a frontage of fifty feet. In the modifying agreement the required frontage was increased to one hundred feet and the required area to nine thousand feet, and upon the Map No. 3 accompanying that agreement, all the lots on Outlook Drive (except lots 53 to 57 inclusive) had a frontage of at least one hundred feet. The required frontage of one hundred feet was thus made to apply equally to the lots on Outlook Drive as well as those on Beach Drive.

Plaintiff's lot has a frontage of 179.81 feet on Outlook Drive, a depth along its easterly boundary, with reference to that frontage, of 149.07 feet, and an area of twenty-two thousand square feet, more than twice the minimum required. Beach Drive in front of the plaintiff's lot runs into Outlook Drive upon a curve with a radius of fifty feet, and the lot has a frontage of 64.84 feet upon the curve. It thus has a total frontage of 113.64 feet on Beach Drive and the intersection of Beach Drive and Outlook Drive which is common to both streets. "Restrictions, in the framing of which a subsequent purchaser has had no voice, ought to be so clear that by the acceptance of the deed that declares them he may reasonably be deemed to have understood and acceded to them." *Howland* v. *Andrus,* 81 N. J. Eq. 175, 181, 86 Atl. 391. The restriction that the premises within the middle zone should not

be subdivided into lots having a frontage of less than one hundred feet and an area of less than nine thousand square feet, might reasonably be understood and construed to permit the subdivision of lot 32 as was here done.

The trial court correctly held that the frontage and area of the plaintiff's lot satisfied the restriction in the Weed modifying agreement. Nor does it violate the restriction contained in the deeds of the lots sold by the defendant that they should not be subdivided. In inserting restrictions in its deeds the defendant followed the restrictions in the Weed modifying agreement. None of the lots sold by it in this area had a frontage of more than one hundred feet, and this restriction went no further than to require a compliance with the restriction in the Weed agreement that the frontage of the lots should not be less than one hundred feet.

The plaintiff further contends that the Map No. 3, prepared and recorded by the defendant in accordance with its general plan of development, created an implied covenant that there should be no change in the size or shape of the lots shown thereon, and that the subsequent division of lot 32 shown on the map constituted a violation of this implied covenant.

When an owner of land causes a map to be made of it upon which are delineated separate lots and streets by which access may be had to them, and then sells the lots, referring in his conveyance to the map, the lot owners acquire, either upon the principle of estoppel or of an implied contract, the right to have the streets kept open for use in connection with their lands. *Whitton* v. *Clark,* 112 Conn. 28, 32, 151 Atl. 305. The owners of such lots are assumed to have bought them in reliance upon the right of access to the streets shown upon the map, in so far as such

right was beneficial to them. Upon the same principle, when the lots are shown upon the map as facing upon an open square or park, the purchasers may acquire the right to have such park kept open for their benefit. *Pierce* v. *Roberts,* 57 Conn. 31, 17 Atl. 275.

The plaintiff's contention would require us to go further and hold that, when lots are plotted upon a map and sold in pursuance of a general plan of development with reference in the deeds to the map, there is created an implied covenant that no change will be made in the size or shape of the lots as thereon delineated, based upon the assumption that the purchasers of such lots buy them in reliance upon a right to have them remain unchanged. It is apparent that there is not the same basis for such an assumption as exists in the case of streets or parks appearing upon such a map. The sale of lots with reference to a map upon which they are plotted does not of itself create an implied covenant on the part of the vendor that the size of the remaining lots upon the map will not be changed. See cases in annotation to *Utujian* v. *Boldt,* in 57 A. L. R. 764 (242 Mich. 331, 218 N. W. 692).

Plaintiff concedes that the mere making and recording of a map and the sale of lots shown thereon does not create an implied covenant that the lots shall not be subdivided, but contends that where there is a general development plan with uniform restrictions such a covenant is implied. The adoption of a general plan for the development of a tract of land under uniform restrictions evidences an intention that the restrictive covenants are for the mutual benefit of the lots, with the result that they are enforceable between the several owners of the lots into which the tract is subdivided. But the covenants which are thus made enforceable to that extent are of course the covenants

contained in the deeds imposing the uniform restrictions. The existence of uniform restrictions in the deeds is evidence of the adoption of a general plan imposing such restrictions upon all of the lots upon the map, but the restrictions thus imposed are the express restrictions contained in the deeds. There does not necessarily arise, from the adoption of the plan, any implied covenant as to the size or shape of the lots in addition to these express restrictions. The existence of the express restrictions in the deeds indicates that those restrictions and no others were the restrictions which it was contemplated in the adoption of the general plan were to be imposed upon all the lots in the restricted tract, and negatives the existence of any implied covenants inconsistent with those expressly stated in the deeds.

The general plan for the improvement of the area here involved restricted the subdivision of the property into lots of not less than one hundred foot frontage with an area of not less than nine thousand square feet. The deeds contain no other restrictions as to the size or shape of the lots in the restricted area, and none can be implied from the adoption of the general plan. Lots 32 and 50 were capable of subdivision into lots having the minimum frontage and area required by the express restrictions imposed under the general plan, and the adoption of the plan did not, under the circumstances, create any implied covenant that they should not be so subdivided. The mere making and recording of the map did not create an implied covenant that these lots should not be subdivided into lots which did not violate the express restrictions imposed under the general plan.

It is conceivable that a general scheme of development might be shown, in which a uniformity of design of the size or shape of the lots and their relative posi-

tion with reference to a parkway or road, was so manifestly essential to the development of the area as planned, that, in the absence of express restrictions, it might fairly be assumed that purchasers of lots relied upon the preservation of such design, and the law might imply a covenant to prevent a change which would defeat the whole plan of development. But that is not the situation in the present case.

A house has already been constructed upon lot 32A, but, since the subdivision of lot 32 did not violate the restrictive covenants, the erection of a house upon 32B would not violate the covenant that only one house should be built upon a single lot.

There is no error.

In this opinion the other judges concurred.