CONNECTICUT BANK & TRUST COMPANY *v.* STEPHEN PONTIAC-CADILLAC, INC.

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CV 7-675-10064

Argued July 15—decided August 9, 1968

*James E. Hayes,* of Bristol, for the appellant (defendant).

*David Brown,* of Meriden, for the appellee (plaintiff).

JACOBS, J. On July 29, 1966, Joseph D. Morin of Plainville, Connecticut, hereinafter referred to as the buyer, purchased from the defendant, hereinafter referred to as the dealer, a new 1966 Pontiac two-door hardtop sedan, under a retail instalment contract, for a total cash delivered price of $4080.50. The buyer was given a trade-in allowance on his 1963 Pontiac car of $833.99, leaving an unpaid balance due of $3246.51, to which finance charges aggregating $487.41 were added, leaving a time balance of $3733.92, payable in thirty-six monthly instalments of $103.72 each, commencing on August 30, 1966. It was prearranged between the parties prior to the sale that efforts would be made to obtain the necessary financing of the automobile through the plaintiff bank, hereinafter referred to as the bank. Accordingly, pursuant to such an arrangement, the dealer's salesman telephoned the bank and gave it the required information to enable the bank to pre-

pare a retail instalment contract. After it was prepared, the salesman obtained the contract from the bank and returned to the dealer's place of business where it was executed by the dealer and the buyer. Thereafter, the salesman brought the executed contract with the assignment to the bank and in return received a check payable to the dealer in the sum of $3733.92.

The dealer's general manager, Joseph DeGonge, prepared the application for certificate of title, which was signed by Morin, as the buyer, and by the defendant, as the dealer. In preparing and executing the application for certificate of title, the dealer failed to protect the bank's security interest by making a notation of its lien on the application. On August 13, 1966, the commissioner of motor vehicles mailed to the buyer the certificate of title, showing the vehicle free and clear of all liens and encumbrances.

The buyer made a number of payments to the bank, viz., a first monthly payment of $130.75 on August 29, 1966, a second monthly payment in the same amount on October 31, 1966, and a third monthly payment in like sum on November 21, 1966; no further payments were made except a payment of $25 on January 23, 1967. Thereafter, the bank made many efforts to obtain payments, but these efforts proved futile. Meanwhile, during the period from September, 1966, to February, 1967, the buyer was having personal and domestic troubles which ultimately led to his confinement for a short time in a state hospital. Finally, in March, 1967, the bank, frustrated in its attempts to obtain payments from the buyer, turned the matter over to its attorney, who immediately issued a writ of replevin; the replevin action, however, proved of no avail because, a few days previously, Morin had sold the car to a third party free of the bank's lien.

Upon the foregoing facts, the trial court concluded that (1) the dealer was negligent in failing to make the notation of the bank's lien on the application for certificate of title; (2) the dealer had violated its statutory duty as defined in § 14-171 (b) of the General Statutes; (3) the dealer broke the warranty implied in the assignment; and (4) the bank was not guilty of contributory negligence or laches. Accordingly, the court found the issues for the bank and rendered judgment in its favor for $3066.44 and interest thereon of $122.64.

The defendant's main contention on this appeal is that when the bank knew, or should have known, that it did not have in its possession the certificate of title to the car, it should have taken immediate appropriate action, and that, by waiting until March, 1967, before turning the matter over to its attorney, the bank was itself guilty of contributory negligence and laches constituting a bar to recovery.

I

The 1955 National Conference of Commissioners on Uniform State Laws promulgated the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act. Handbook of National Conference of Commissioners on Uniform State Laws, p. 172 (1955). It was recognized than an automobile was a chattel of a highly mobile character with frequent changes in ownership. Motor vehicle certificate of title statutes were developed, inter alia, to impede the sale of stolen motor vehicles and to "facilitate vehicle sales and sales financing by simplifying procedures for transfers and the creation and perfection of liens." Id., p. 170. In 1957, Connecticut joined the states with exclusive certificate of title acts by adopting verbatim the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act, hereinafter referred to as the Uniform Act. Public Acts 1957, No. 607, as

amended, General Statutes §§ 14-165—14-211. The act became effective on July 1, 1959. See comment, "Connecticut Motor Vehicle Certificate of Title and Anti-Theft Act," 33 Conn. B.J. 223. Our certificate of title act may be referred to, from the point of view of security interests, as exclusive. "That is to say, compliance with the certificate of title act is the exclusive method of perfection of a security interest, and filing under the otherwise applicable security statute is not required and is of no effect if made." 1 Gilmore, Security Interests in Personal Property § 20.1, p. 553. The Uniform Act consists of five permanent parts: Part I (General Statutes §§ 14-165 through 14-168) deals with definitions and exclusions, Part II (§§ 14-169 through 14-195) with certificates of title, Part III (§§ 14-196 through 14-200) with offenses and antitheft provisions, Part IV (§§ 14-201 through 14-209) with previously registered vehicles, and Part V (§§ 14-210 through 14-211) with the gradual effectuation of the act.

We are concerned on this appeal with the construction of Part II of the Uniform Act, specifically, with respect to a car which is the subject matter of an "application for the first certificate of title . . . in this state." See § 14-171. That section prescribes certain information which the application must contain, such as name, residence and address of the owner; description of the vehicle; date of purchase; name and address of the transferor; and names and addresses of lienholders; it further authorizes the commissioner of motor vehicles to require any additional information which may be reasonable. And where, as in the instant case, the car has been purchased from a dealer, the Uniform Act provides (§ 14-171 [b]): "If the application refers to a vehicle purchased from a dealer, it shall contain the name and address of any lienholder holding a security interest created or reserved at the time of the

sale and the date of his security agreement and be signed by the dealer as well as the owner, and the dealer shall promptly mail or deliver the application to the commissioner." The commissioner, if he is satisfied with the "genuineness and regularity" of the application, if the proper fees have been paid, and if the applicant appears to be entitled to a certificate, is directed to issue a certificate of title. § 14-173. The certificate must contain, in addition to "any other data the commissioner prescribes," the title number assigned to the vehicle and a description of the vehicle as well as "the names and addresses of any lienholders, in the order of priority as shown on the application . . . ." § 14-174. A key provision (§ 14-175) is that "[t]he certificate of title shall be mailed to the first lienholder named in it or, if none, to the owner." Thus, it becomes readily apparent that the lienholder's only protection under the provisions of the Uniform Act depends on possession of the certificate of title.

In *Aurora National Bank* v. *Ed Fanning Chevrolet,* 85 Ill. App. 2d 394, the Illinois intermediate appellate court construed Ill. Rev. Stat. c. 95½ § 3-104 (b) (1965), which is practically identical to General Statutes § 14-171 (b), quoted above. The court there said (p. 396) : "The clear language of the statute places two duties on the shoulders of the dealer. He must sign the application, which will set forth the lien, and he must mail or deliver it to the Secretary of State. It would have been meaningless for the legislature to require the dealer to sign the application if they did not intend that the dealer see to it that the lien were correctly shown upon that application. The legislature is presumed to know the realities and among them is the fact that the dealer is sophisticated in these matters . . . ." In other words, the dealer is in the best position to know the intricacies and vagaries of the trade.

Leary, "Horse and Buggy Lien Law and Migratory Automobiles," 96 U. Pa. L. Rev. 455, 469.

In the last analysis, the function of the law in this area of litigation is the allocation of the loss between two victims. It matters little whether the dealer's omission to make the notation on the application was intentional or the result of mere mistake or inadvertence; "liability must follow, under the familiar doctrine that where one of two innocent persons must suffer, he should bear the burden whose conduct induced the loss . . . . The loss suffered by plaintiff can be directly traced to the wrongful conduct of the defendant in the premises." *Westlake Finance Co.* v. *Oak Park Motors, Inc.,* 19 Ill. 2d 66, 72; see *Dissing* v. *Jones,* 85 Ariz. 139, 141. It was the dealer who set in motion the chain of events resulting in the bank's loss. In this kind of transaction, the bank's reliance on the dealer was justified.

Thus, in our view of the case, basing our affirmance of the judgment on the dealer's wrongful conduct, we deem it unnecessary to consider or discuss the claim that the dealer broke the terms of the warranty implied in the assignment.

## II

We are not persuaded by the defendant's argument that the bank was guilty of lack of diligence amounting to laches in not acting promptly in the pursuit of its rights and that this lack of diligence was the responsible factor in bringing about the loss. "Unreasonable delay, that is, laches *(Gage* v. *Schavoir,* 100 Conn. 652, 664 . . .), consists of two elements: 'First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant.' " *Sarner* v. *Fox Hill, Inc.,* 151 Conn. 437, 444. "Delay alone is not suffi-

cient to bar a right . . . . Delay, if unreasonable, is one element of laches; . . . or, if justifiably relied on, is one element of estoppel." *Owens* v. *Doyle,* 152 Conn. 199, 207. "What constitutes reasonable diligence can be determined by no established rule, for the question must be determined upon the circumstances of each case." 2 Pomeroy, Equity Jurisprudence (5th Ed.) § 419c. "A conclusion that a plaintiff has been guilty of laches is one of fact for the trier and not one that can be made by this court, unless the subordinate facts found make such a conclusion inevitable as a matter of law." *Kurzatkowski* v. *Kurzatkowski,* 142 Conn. 680, 684; see *Pascale* v. *Board of Zoning Appeals,* 150 Conn. 113, 119; 30A C.J.S., Equity, § 115. "When a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief." 2 Pomeroy, op. cit. § 419d; see *Chase* v. *Chase,* 20 R.I. 202, 204.

Since "the question of laches is addressed to the sound discretion of the court"; 30A C.J.S. 40, Equity, § 115; we cannot say that on this record the trial court abused its discretion in failing to find laches. Moreover, since the dealer was in a better position than the bank to avert the loss, the conclusion must be that it, the dealer, must be held answerable for the loss.

There is no error.

In this opinion DEARINGTON and KINMONTH, Js., concurred.