## HONDA CITY TRIUMPH, INC. *v.* FIRST NATIONAL BANK OF SOUTHERN MARYLAND

[No. 85, September Term, 1982.]

*Decided October 7, 1982.*

The cause was argued before MOORE, WILNER and GARRITY, JJ.

*Sidney Blum* for appellant.

*Robert Y. Clagett* for appellee.

WILNER, J., delivered the opinion of the Court.

On January 17, 1980, Richard Rueb agreed to purchase a 1980 Honda Accord from appellant Honda City-Triumph, a licensed automobile dealer. The purchase order signed by the parties described the vehicle, showed the purchase price to be $6,817, recited a $100 deposit (apparently charged on a VISA card), and called for the balance of $6,717 to be paid in cash at time of delivery.

The next day, with purchase order in hand, Mr. Rueb applied for and received a loan from appellee First National Bank of Southern Maryland in order to pay for the car. The gross amount of the loan was $6,277, payable in forty-eight monthly installments of $130.78, but after deducting interest over that period and certain other charges, the net proceeds of the loan came to $5,037. Rueb signed a security agreement purporting to grant the bank a security interest in the automobile, and the bank issued two checks. The first, representing the loan proceeds of $5,037, was made payable to Rueb and "Honda City, Inc."; the second, to cover the cost of recording a lien with the Motor Vehicle Administration (MVA), was for $12 and was made payable to Rueb and the State Department of Transportation (of which MVA is a part).

Prior to delivery of the $5,037 check, the bank typed on the back of it the following statement:

"LIEN

The proceeds of this check represent a loan of $6,277.44 on a 1980 Honda Accord and in consideration thereof the undersigned agrees to register and/or record a lien in said amount on the title thereto in favor of the First National Bank of Southern Maryland, Upper Marlboro, Md. as evidenced by Chattel Mortgage dated January 18, 1980. Serial #SMK 2035383"

Rueb returned to the dealer on January 19, endorsed the

bank check over to it by signing his name directly below the aforequoted typed statement, and took delivery of the car. In derogation of that statement, however, Rueb told appellant's assistant manager (who had sold him the car) that no lien was to be placed on the car, and he did not turn over the $12 check. Appellant accepted the $5,037 check toward the purchase price of the car, endorsed the check underneath Rueb's signature, and promptly deposited it. Appellant took no steps, however, to see that the bank's lien was duly recorded with MVA or to notify the bank that its lien was not being so recorded.

About a month after the transaction, the $12 check, which had not been negotiated, was returned to the bank by Rueb. No inquiry was made at that time as to why the check had not been negotiated. Rueb made his regular monthly payments on the loan through May, 1980. In July, the loan fell into default, and the matter was turned over to the bank's collection department.

The collection manager soon learned that appellant had failed to record the lien. He also learned, to his dismay, that Rueb had moved to Alabama, sold the Honda, and filed a petition in bankruptcy. It was later confirmed that Rueb had received a discharge in bankruptcy, and the bank was left with a balance of $5,053 unpaid on the automobile loan. Having no further recourse against Rueb, the bank sued appellant in the Circuit Court for Anne Arundel County, claiming both a breach of contract and conversion.

After a non-jury trial, the court found that the typed statement on the back of the $5,037 check constituted a contract which appellant had breached; and, on that basis, it awarded the bank a judgment in the amount of $5,053. Aggrieved by that determination, appellant turns to us with the questions:

> "1. Did the Court err in finding the existence of a contract between the Bank and Honda City which was breached by Honda City?

[and]

2. Is the Bank limited to nominal damages for failure to mitigate damages?"

We shall answer both questions in the negative, and thus shall affirm the judgment entered by the circuit court.

## (1) *Liability*

The situation presented in this appeal has essentially three elements: (1) a lending institution (bank) agrees to lend a customer money to buy a car, intending that its loan be secured by a lien on the car; (2) the bank, which may or may not have had prior dealings with the automobile dealer, relies on the dealer to see to it that a lien is properly recorded with the State MVA; and (3) it manifests that reliance by language on the check for the loan proceeds issued to the customer (jointly with the dealer) and by tendering the cost of recording the lien.

This is not an uncommon practice in financing the retail purchase of automobiles; and occasionally, as here, it happens that the dealer neglects to record the lien, the buyer/borrower later defaults on the loan, and the bank ends up suffering some loss by not having the car as collateral.

There have been a number of cases around the country in which banks placed in that position have sought recompense from the dealer, and they have usually been successful. *See, for example,* the line of Illinois cases beginning with *Westlake Finance Company v. Oak Park Motors, Inc.,* 166 N.E.2d 23 (Ill. 1960), and continuing with *Aurora National Bank v. Ed Fanning Chevrolet, Inc.,* 229 N.E.2d 2 (Ill.App. 1967), and *South Division Credit Union v. Deluxe Motors, Inc.,* 355 N.E.2d 715 (Ill.App. 1976).[1] *Also Oroweat Emp. Credit Union v. Stroupe,* 269 S.E.2d 211 (N.C.App. 1980); *United, Etc. v. Dick Herriman Ford, Inc.,* 210 S.E.2d 158 (Va. 1974); *White Truck Sales v. Shelby Nat. Bank,* 420

---

1. In *South Division Credit Union,* the court recognized and applied the general rule laid down in *Westlake Finance Company* but exonerated the dealer because, in the circumstances of that case, the bank's loss was not shown to be attributable to the dealer's failure to record the lien.

N.E.2d 1266 (Ind.App. 1981); *Connecticut B. & T. Co. v. Stephen Pontiac-Cadillac,* 257 A.2d 510 (Conn.App. 1968); *Rebsamen Cos., Inc. v. Arkansas St. Hosp. Emp. F.C.U.,* 522 S.W.2d 845 (Ark. 1975); *Atlanta Motorcycle Sales, Inc. v. Fulton National Bank,* 248 S.E.2d 558 (Ga. 1978); *and cf. Don Lorenz, Inc. v. Northampton National Bank,* 381 N.E.2d 1108 (Mass.App. 1978), and *Federal Employees Cr. U. v. Capital Automobile Co.,* 183 S.E.2d 39 (Ga.App. 1971).

Two theories have been developed in support of the dealer's liability: (1) that the statement placed on the back of the bank's check represents a contract with the dealer — the agreement of the bank to facilitate the sale of the car by making the loan, in return for the dealer's commitment to protect the bank by seeing to it that the bank's security interest is perfected; and (2) a statutory obligation of the dealer to include notice of the lien in the submissions required to be made to the State MVA.

The two theories to some extent interrelate; *i.e.,* the relationships among the parties — buyer, seller, and bank — are to a degree influenced by certain statutory requirements. It is well, therefore, to begin with the statutory framework.

There was a time, before 1971, when liens on motor vehicles were perfected in the same manner as liens on other chattels — by filing the chattel mortgage (or, after adoption of the Uniform Commercial Code, a financing statement) with the appropriate county recording officer. Notwithstanding requirements in the motor vehicle code that both applications for certificates of title and the certificates themselves contain a statement of all liens and encumbrances on the automobile (*see* former Md. Code (1967 Repl. Vol.), art. 66½ §§ 24 and 28(c)), the rights of a secured lender were governed by the terms of his security agreement and its recording in the required manner, and not by whether the lien was noted on the certificate of title. *See Huettner v. Sav. Bank of Balto.,* 242 Md. 477 (1966).

As the result of enactments in 1971 (Acts of 1971, ch. 398) and 1973 (Acts of 1973, ch. 688), however, that is no longer

the case. Current Maryland law provides a special way of perfecting a security interest in motor vehicles; compliance with the normal rules set forth in the Uniform Commercial Code (Md. Code., Comm. Law art., title 9) is not enough. The new ground rules are set out in Transp. art., § 13-202.

Section 13-202 (a) provides, with exceptions not relevant here, that "a security interest in a vehicle is not valid against any creditor of the owner or any subsequent transferee or secured party unless the security interest is perfected as provided in this subtitle." Section 13-202 (b) then states:

"(1) A security interest [in a motor vehicle] is perfected by:

(i) Delivery to [MVA] of every existing certificate of title of the vehicle and an application for certificate of title on the form and containing the information about the security interest that the [MVA] requires; and

(ii) Payment of a filing fee of $12, which is in addition to any other fees that apply under the Maryland Vehicle Law.

(2) The security interest is perfected at the time of its creation, if the delivery and payment to the [MVA] are completed within 10 days of the date of its creation. Otherwise, the security interest is perfected at the time of the delivery and payment."

Section 13-207 confirms the exclusivity of this method with the flat statement that "[t]he method provided in this subtitle of perfecting and giving notice of security interests is exclusive." *See also* Md. Code, Comm. Law art., § 9-302 (3), both prior to and after the changes made by Acts of 1980, ch. 824.

The scheme envisioned by this special procedure is that (1) MVA would be a central repository for all liens on motor vehicles registered in Maryland, and (2) the primary source of notice of the secured party's interest in the vehicle would

be the certificate of title itself, rather than an index or books kept in the county courthouse.[2]

The Legislature recognized the pivotal role that dealers would have to play in order to make this new system work properly, and it therefore imposed certain specific duties on them. Normally, it is the obligation of the *owner* of a vehicle — *i.e.,* the buyer — to apply for a certificate of title. Transp. art., § 13-104 (a). When the car is sold (at retail) by a dealer, however, it is the *dealer's* responsibility to see that a proper application is filed. Section 13-113 (c) (2) of the Transp. article requires a dealer, when transferring a Class A (passenger) vehicle to someone other than another dealer to "(i) Obtain from the transferee a completed application and collect all taxes and fees required for titling the vehicle; and (ii) Within 15 days of the date of delivery of the vehicle, send them together with every other document required by § 13-104 of this subtitle to the [MVA]."

Section 13-104 specifies the information to be contained in the "completed application" obtained from the transferee. Subsection (b) (3), in particular, requires the application to state: "(i) The applicant's title to and each security interest in the vehicle; and (ii) The name and address of each secured party with any security interest in the vehicle and the nature and order of priority of that interest. . . ."

When using the method of financing evident here, the bank must necessarily rely upon the dealer to see that its lien is perfected. There is no other practical way it can be done under § 13-202(b). Perfection of the lien requires an application for a new certificate of title, and that is a matter solely in the hands of the dealer.

It is in that light that we look to the statement placed by

---

**2.** In *Huettner, supra,* 242 Md. at 482, the Court, drawing on earlier cases, held that the Department of Motor Vehicles was "not a record office for the recording of liens" and that the registration provisions of the motor vehicle code were not recording statutes. That was changed with the aforementioned 1973 law (Acts of 1973, ch. 688), which, in the words of its title, provided "for central filing of security interests in motor vehicles titled by the [MVA]." The act eliminated the requirement that liens be filed in the county record office and left MVA as the sole and central place to record such liens.

the bank on the back of its check — a check payable *jointly* to Rueb and appellant.[3] The statement is clear. It notes that the check represents the proceeds of a $6,277 loan on a 1980 Honda Accord, Serial No. SMK 2035383 (which is the very car purchased by Rueb from appellant), and provides that "the undersigned agrees to register and/or record a lien in said amount on the title thereto in favor of [appellee] . . . ."

The tendering of that check, with that language on it, represented an offer to Rueb and appellant — an offer to finance Rueb's purchase of the car made manifest by a contemporaneous tender of performance, in return for their agreement to perfect the bank's lien. The offer was of a type that Corbin refers to as "the offer of an act for a promise," as to which he says, "The acceptance of the benefit of the services [or other tender] is a promise to pay for them, if at the time of accepting the benefit the offeree has a reasonable opportunity to reject it and knows that compensation is expected." 1 *Corbin on Contracts,* § 71 (1963 ed.). *See also Laurel Race Course v. Regal Constr.,* 274 Md. 142, 156 (1975).

When Rueb and appellant accepted and negotiated the check, they became "the undersigned" referred to by the bank, and in doing so and proceeding to consummate the sale, they necessarily accepted the bank's offer. As the Court said in *Rossi v. Douglas,* 203 Md. 190, 199 (1953), and again more recently in *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332 (1982), absent fraud, duress, or mutual mistake, none of which are evident here, "one having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signature."

This is precisely the conclusion reached by the North Carolina court in *Oroweat Emp. Credit Union v. Stroupe, supra,* 269 S.E.2d 211. There too a buyer borrowed from a

---

3. Appellant calls attention to the fact that the co-payee on the check was "Honda City, Inc.," and not "Honda City-Triumph." That did not stop Honda City-Triumph from endorsing and depositing the check, however; and we shall accord the discrepancy no greater significance than did appellant when it accepted the benefit of the check.

bank (credit union) to finance the purchase of a new car. She presented to the dealer the credit union's check payable jointly to herself and the dealer containing a statement on the back that "[e]ndorsement hereon acknowledges payment in full and guarantees legal title to [the credit union] on the below described vehicle." The dealer accepted the check and both payees endorsed it. In derogation of that statement, however, the dealer issued the title certificate to the buyer instead of to the bank; and the buyer ultimately defaulted on the loan. The Court viewed the matter thusly (269 S.E.2d at 214):

> "The issue before us is simply a matter of contract. The credit union in effect said, 'If you want our money, you have to protect us by putting title in our name, and here is the make, model, serial number and description necessary for you to do so. Endorsement of this check is a guarantee that this is done.' Both [the buyer] and [the dealer] endorsed the check as joint payees. There was an offer (the language on the back of the check), acceptance (endorsement), and exchange of consideration (title to the credit union, money to the joint payees)."

The Illinois cases proceed more on the theory of the dealer's statutory obligation. As summarized in *South Division Credit Union v. Deluxe Motors, Inc., supra,* 355 N.E.2d 715, 718 (citations omitted):

> "The Illinois Vehicle Code . . . places a duty upon the automobile dealer to assure that the lender's security interest will appear on a certificate of title. . . . A dealer who places the debtor in possession of the collateral as well as a certificate of title which fails to show the existing lien provides the debtor with an opportunity to perpetrate a fraud upon the lender. . . . In such circumstances it is reasonable for the dealer to anticipate that the lender's security interest might be terminated in the debt-

or's dealings with third parties *and to be liable for the loss occasioned by his wrongful conduct."* (Emphasis supplied.)

As we have already observed, these theories of liability are not mutually exclusive. Because the dealer has the primary responsibility for submitting to MVA a complete and accurate application, including the notation of all security interests, it is reasonable for lenders to rely on the dealer to carry out that responsibility. Where, as here, the dealer *knows* that the purchase is being financed and has clear evidence that the lender is in fact relying upon it to perfect the security interest, the dealer, by consummating the sale, undertakes a duty to the lender to perform its statutory obligation. If, for whatever reason (including Rueb's importuning), the dealer "could not perform pursuant to the terms of the endorsement, it should have refused to negotiate the check and it should have returned the check to [the bank]; in other words, it should not have entered into the contract." *Oroweat Emp. Credit Union v. Stroupe, supra,* 269 S.E.2d at 215.

## (2) *Damages*

Appellant does not contest the method by which the judgment of $5,053 was calculated. Its argument, rather, is that the bank was put on notice when the $12 check was returned unnegotiated that its security interest had not been perfected, that it had a duty to take some action at that time, and that by failing to take such action it failed in its duty to mitigate its loss. From this tenuous bit of reasoning, appellant argues that the bank is entitled to no more than "nominal" damages.

We disagree. In the first place, mere return of the check would not necessarily indicate that appellant had failed to include notice of the lien on the application or to remit the $12 filing fee. At face value, it would simply mean that the bank's check was not used for that purpose. At the time, and for several months thereafter, the loan was current; Rueb,

according to the evidence, was a good customer of the bank; and there was no cause for alarm. Once the loan fell into default, the bank acted with commendable dispatch in investigating the matter. From the record in this case, we find no failure to mitigate damages. *See Connecticut B. & T. Co. v. Stephen Pontiac-Cadillac, supra,* 257 A.2d 510.

> *Judgment affirmed; appellant to pay the costs.*